UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
ANA KERR,[1]

                Plaintiff,

   -against-

HSBC BANK, USA, N.A., as Indenture
Trustee for the registered note holders of
Renaissance Home Equity Loan Trust
2005-3, Renaissance Equity Loan
Asset-Backed Notes, Series 2005-3, and
OCWEN LOAN SERVICING, LLC,

                Defendants.
------------------------------------------------------X

For Online Publication Only

**AMENDED MEMORANDUM AND ORDER**
13–CV–68 (JMA)

A P P E A R A N C E S:

Michael Valentine
The Valentine Law Firm, PC
225 Broadway, 39th Floor
New York, NY 10007
    *Attorney for Plaintiffs*

Sara Louise Markert
Houser & Allison, APC
60 E. 42nd Street, Suite 1148
New York, NY 10165
    *Attorney for Defendants*

**AZRACK, United States Magistrate Judge:**

    Plaintiffs Verna Kennedy and Ana Kerr filed this action against Ocwen Loan Servicing, LLC ("Ocwen") and HSBC Bank, USA, N.A., as Indenture Trustee for the registered note holders of Renaissance Home Equity Loan Trust 2005-3, Renaissance Equity Loan Asset-

---

[1] The Clerk of the Court is hereby directed to amend the caption as shown above. When this action was originally filed, Verna Kennedy was also a plaintiff. Kennedy, however, died in September 2013. (2013 Loan Modification Agreement at 1, ECF No. 20.) Ana Kerr is now the only remaining plaintiff. See Fed. R. Civ. P. 25(a). Nevertheless, for ease of reference, this opinion will continue to refer to "plaintiffs" collectively.

Backed Notes, Series 2005-3 ("HSBC") (collectively with Ocwen, "defendants"). Plaintiffs allege various claims under New York law arising out of Ocwen's modification of plaintiffs' mortgage loan. The parties have consented to me for all purposes including entry of final judgment. (ECF No. 11.)

Plaintiffs have settled their claims, except for the issue of attorney's fees, which the parties have submitted to me for determination. For the reasons stated below, I award plaintiffs $14,833.60 in attorney's fees.

## I. BACKGROUND

Kennedy was the owner of a property in Brooklyn ("the Premises"), which served as both plaintiffs' primary residence. (Compl. ¶¶ 2, 5, Notice of Removal, Ex. A, ECF No. 1.)[2] In 2004, Kennedy executed a note and accompanying mortgage for the Premises. (2013 Loan Modification Agreement ("2013 Modification") at 1, ECF No. 20.) Kerr was later added as a borrower on the loan. (Id.) HSBC holds the note and mortgage. (Compl. ¶ 6.) Ocwen services the loan. (Id. ¶ 7.)

In July 2011, plaintiffs and Ocwen entered into a modification agreement (the "2011 Modification") that required plaintiffs to pay $2,115.75 per month, including an escrow of $231.00 for real estate taxes and hazard insurance. (Id. ¶ 8; 2011 Modification, ECF No. 21.) The 2011 Modification included a fixed interest rate of 2.24%. (2011 Modification.) Beginning in August 2011, Ocwen sent plaintiffs monthly coupons that each directed payment of $2,115.75. (Compl. ¶¶ 11–12.) Plaintiffs have paid this amount every month. (Id. ¶ 12.)

---

[2] Citations to plaintiffs' complaint are merely to provide background and context for the instant fee dispute. The Court is not making any factual findings concerning those allegations.

In August 2012, Ocwen increased plaintiffs' monthly payment. (Id. ¶ 14.) That month, Ocwen sent plaintiffs a monthly coupon that included a substantial increase in the monthly escrow charge. (Id. ¶ 14.) After plaintiffs contacted Ocwen about the increase, plaintiffs received an escrow account statement showing a special quarterly assessment of $1,333.40 for "POLICY #3000328851001." (Id. ¶ 17.) This quarterly assessment began in March 2011, prior to the 2011 Modification, and was imposed every three months thereafter. (Id. ¶¶ 17, 18.) However, the monthly coupons Ocwen provided to plaintiffs did not reflect this special assessment until August 2012. (Id. ¶ 21.)

Plaintiffs allege that Ocwen never disclosed the special quarterly assessment or included it in the 2011 Modification. (Id. ¶¶ 8, 19, 21.) Rather, Ocwen allegedly represented that the escrow listed was only for real estate taxes and hazard insurance. (Id. ¶ 8.)

In October 2012, Ocwen notified plaintiffs that they had to pay $8,909 stemming from the unpaid special quarterly assessments. (Id. ¶ 24.) If plaintiffs failed to make this payment by December 31, 2012, Ocwen would declare the mortgage in default and commence a foreclosure action. (Id.)

On December 20, 2012, plaintiffs filed the instant suit in Kings County Supreme Court. (Compl.) Plaintiffs' complaint alleges a violation of New York's consumer protection statute, N.Y. Gen. Bus. Law § 349 ("GBL § 349"), as well as breach of contract, fraud, and a claim of unconscionablity. (Id.) The complaint seeks: (1) a declaration that plaintiffs were not in default of the 2011 Modification; (2) a declaration that the note, mortgage and 2011 Modification were all unconscionable and void; and (3) not less than $150,000 in damages, including statutory and punitive damages under GBL § 349.

Along with their complaint, plaintiffs filed a motion for a temporary restraining order ("TRO") and preliminary injunction to prevent defendants from commencing a foreclosure proceeding. (Pls.' Mem. in Supp. of Order to Show Cause, Notice of Removal, Ex. B.) On December 26, 2012, the Honorable David Schmidt signed an order to show cause restraining defendants from foreclosing on the mortgage until a January 7, 2013 hearing. (Order to Show Cause, Notice of Removal, Ex. B.)

On January 4, 2013, defendants removed this action on the basis of diversity jurisdiction. (Notice of Removal.) At the March 7, 2013 initial conference, plaintiffs informed me that they intended to file a pre-motion conference letter for a proposed motion to have this action remanded to back to state court for lack of diversity. Rather than litigating the remand issue, I convinced the parties to discuss settlement. (Mar. 7, 2013 Minute Entry, ECF No. 5.) At the initial conference, defendants took the position that the 2011 Modification was only a temporary modification that was supposed to be replaced by a permanent modification with a higher interest rate. (See Pls.' Reply Ltr. in Supp. of Fees Appl. ("Pl. Reply Fees Ltr."), ECF No. 14.)

As part of the settlement discussions, defendants provided plaintiffs with a loan reconciliation and agreed not to proceed with the foreclosure. (Mar. 21, 2013 Minute Entry, ECF No. 6; see also Pl. Reply Fees Ltr. at 1.) The parties eventually agreed, in June 2013, to settle plaintiffs' underlying claims and to submit the issue of attorney's fees to the Court. (June 20, 2013 Minute Entry, ECF No. 9; Stipulation of Settlement, ECF No. 22.)

Although the parties submitted papers on the fee issue in June and July of 2013, those papers did not include a copy of the settlement agreement. After the Court directed the parties to file a stipulation of dismissal for the underlying claims, the parties informed the Court that they had not yet signed a final settlement agreement and that additional details of the settlement were

still in dispute. (Def.'s Nov. 4, 2013 Ltr., ECF No. 15.) At a November 22, 2013 court conference, the parties resolved their disputes. (Nov. 20, 2013 Minute Entry, ECF No. 17.) On December 23, 2013, the parties filed the signed settlement agreement and a new loan modification agreement (the "2013 Modification"). (Settl. Agreement & 2013 Modification, ECF No. 20.)

The 2013 Modification: (1) reduced the outstanding principal on the loan by $10,000, resulting in an outstanding principal of $384,745; (2) reduced the annual interest rate to 2%;[3] and (3) set plaintiffs' total monthly payment at $2,095. (2013 Modification.) The 2013 Modification does not include the $1,333.40 special quarterly assessment at issue in this action.

Currently pending before the Court is plaintiffs' motion for fees, which seeks $27,720 in fees for roughly 60 hours of work by plaintiffs' counsel. Defendants contend that this fee request should be denied in its entirety. In the alternative, defendants argue that the fee request should be reduced by 75% to $6,745.50.

## II. DISCUSSION

### A. Basis for a Fee Award

In addition to plaintiffs' common law claims, plaintiffs alleged a violation of GBL § 349, which provides that "the court may award reasonable attorney's fees to a prevailing plaintiff." GBL § 349(h). Although fee awards under GBL § 349 are discretionary, the Court finds that a fee award is appropriate here.

Defendants argue that plaintiffs' fee request should be denied in its entirety. However, none of their arguments on this point are persuasive.

---

[3] The parties do not quantify the value of the quarter-point reduction or identify what it would have cost Kerr to purchase this "discount point" in the marketplace. My own calculations indicate that this will save Kerr approximately $12,000 in interest over the life of the loan.

Defendants contend, without citation to any authority, that because this case settled plaintiffs do not qualify as "prevailing" parties. I disagree. One court has observed that "New York law is not clear whether a party who settles a case is entitled to attorney's fees under [GBL § 349]." Serin v. N. Leasing Sys., Inc., 06–CV–1625, 2011 WL 1467560, at *4 (S.D.N.Y. Apr. 19, 2011) (declining to decide this issue because defendants waived their right to contest plaintiffs' entitlement to attorney's fees as part of a settlement agreement), aff'd, 501 F. App'x 39 (2d Cir. 2012). However, fee-shifting statutes that use the term "prevailing party" are generally interpreted to include plaintiffs who obtain favorable settlements. See Perez v. Westchester Cnty. Dep't of Corr., 587 F.3d 143, 149 (2d Cir. 2009) (explaining that "in order to be considered a 'prevailing party'" under 42 U.S.C. § 1988(b), a plaintiff must "achieve some material alteration of the legal relationship of the parties" and the change must "be judicially sanctioned") (quoting Roberson v. Giuliani, 346 F.3d 75, 79 (2d Cir. 2003));[4] cf. Aetna Cas. & Sur. Co. v. Liebowitz, 730 F.2d 905, 908 (2d Cir. 1984) ("[W]hen [Congress] desired to permit attorney's fees to be awarded to a plaintiff who does not litigate his claim through to trial, it knew how to say so, using such broad terms as "substantially prevails" or the "prevailing party.") Defendants have not offered any persuasive argument as to why I should read the "prevailing plaintiff" provision in GBL § 349(h) differently.

Defendants also assert—again without citation to any authority—that plaintiffs do not qualify as prevailing parties under GBL § 349 because they only received injunctive relief. This argument is meritless as GBL § 349 explicitly provides for injunctive relief. GBL § 349(h). Moreover, the loan modification is analogous, in some respects, to a monetary settlement.

---

[4] Under many federal fee-shifting statutes, a settling plaintiff can only recover fees where the settlement is "judicially sanctioned." Roberson, 346 F.3d at 79–80. Even assuming that this requirement applies to claims under GBL § 349, it is met here because I have retained jurisdiction over this settlement. See Stipulation of Settlement; Roberson, 346 F.3d at 82–83.

Finally, defendants argue that no fees should be awarded because the relief plaintiffs obtained was *de minimus*. I disagree. However, as discussed infra, the nature and amount of the relief plaintiff obtained does warrant a reduction in the fee award.

**B. Amount of the Fee Award**

   **1. The Lodestar/Presumptively Reasonable Fee**

For fee applications under federal fee-shifting statutes, "the lodestar—the product of a reasonable hourly rate and the reasonable number of hours required by the case—creates a 'presumptively reasonable fee.'" Millea v. Metro-North R. Co., 658 F.3d 154, 166 (2d Cir. 2011) (quoting Arbor Hill Concerned Citizens Neighborhood Assoc. v. Cnty. of Albany, 522 F.3d 182, 183 (2d Cir. 2008)). In calculating the presumptively reasonable fee, the court should "bear in mind that a reasonable paying client wishes to spend the minimum necessary to litigate the case effectively," and consider any case-specific factors that are relevant to determining the reasonable hourly rate and the reasonable number of hours. Arbor Hill, 522 F.3d at 190 (discussing case-specific factors, including those enumerated in Johnson v. Ga. Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974)).[5]

In addressing fee applications under GBL § 349, courts rely on similar factors—namely, "the time and skill required in litigating the case, the complexity of issues, the customary fee for

---

[5] The twelve Johnson factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Arbor Hill, 522 F.3d at 186 n. 3 (2d Cir. 2008) (citing Johnson, 488 F.2d at 717–19).

7

the work, and the results achieved." Riordan v. Nationwide Mut. Fire Ins. Co., 977 F.2d 47, 53–54 (2d Cir. 1992). In light of this, courts often look to the federal lodestar approach in addressing fee applications under GBL § 349. Diaz v. Paragon Motors of Woodside, Inc., 03–CV–6466, 2007 WL 2903920, at *2 (E.D.N.Y. Oct. 1, 2007); Barkley v. United Homes, LLC, Nos. 04–CV–875, 05–CV–187, 05–CV–4386, 05–CV–5302, 05–CV–5362, 05–CV–5679, 2012 WL 3095526, at *2 (E.D.N.Y. July 30, 2012), aff'd, --- F. App'x ----, 2014 WL 305480 (2d Cir. Jan. 30, 2014); see also Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc., 190 F. Supp. 2d 407, 420 (E.D.N.Y. 2002) ("Lodestar calculations, widely used for federal statutes, provide useful reference points in calculating state fee amounts [under GBL § 349]."), rev'd sub nom., Empire Healthchoice, Inc. v. Philip Morris USA, Inc., 393 F.3d 312 (2d Cir. 2004); Indep. Living Aids, Inc. v. Maxi-Aids, Inc., 25 F. Supp. 2d 127, 133 (E.D.N.Y. 1998) ("Since many of the[] factors [for determining fees under New York law] overlap with the lodestar considerations, they will be addressed together[.]").

"The burden is on the party seeking attorney's fees to submit sufficient evidence to support the hours worked and the rates claimed." Hugee v. Kimso Apartments, LLC, 852 F. Supp. 2d 281, 298 (E.D.N.Y. 2012) (citing Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)); Blue Cross & Blue Shield of New Jersey, Inc., 190 F. Supp. 2d at 420 (GBL § 349 claim).

### a. Reasonable Hourly Rate

The reasonable hourly rate "is the rate a paying client would be willing to pay." Arbor Hill, 522 F.3d at 190. Generally, in setting a reasonable hourly rate, federal courts apply the "forum rule," which looks to the hourly rates of comparable lawyers in the district in which the court sits. Simmons v. N.Y. City Transit Auth., 575 F.3d 170, 174 (2d Cir. 2009). To determine the "prevailing market rates for counsel of similar experience and skill," courts consider awards

in prior cases, the court's own familiarity with the rates in the district, and any other relevant evidence submitted by the parties. Farbotko v. Clinton Cnty. Of New York, 433 F.3d 204, 209 (2d Cir. 2005).

"[W]hen faced with a request for an award of higher out-of-district rates," the Second Circuit has directed district courts to "apply a presumption in favor of application of the forum rule." Simmons, 575 F.3d at 175. To overcome this presumption, the "litigant must persuasively establish that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." Id. Unless this presumption is rebutted, district courts in the Eastern District cannot rely on prevailing hourly rates from the Southern District in order to determine fee awards for litigation situated in the Eastern District. [6] Id.

Courts have Simmons' articulation of the forum rule to fee requests under New York state fee-shifting statutes.[7] See Siracuse v. Program for the Dev. of Human Potential, 07–CV–2205, 2012 WL 1624291, at *27 (E.D.N.Y. Apr. 30, 2012) (rejecting argument that Simmons does not apply to New York City Human Rights Law); Barkley, 2012 WL 3095526, at *7 (applying Simmons to claim under GBL § 349).

Plaintiffs were represented by Michael Valentine and Aaron Altman, who are both based in Manhattan. Valentine has been practicing since 1990 and has extensive experience in real estate litigation, including landlord-tenant matters. (Resume of Michael Valentine, Pl.'s Mot. for Fees ("Pl. Fees Mot."), Ex. C.) Since 2006, he has been a solo practitioner and has also served

---

[6] While recognizing that Simmons controlled the cases before them, courts in this district have criticized Simmons given the close proximity of the Eastern and Southern Districts, and the overlap of their respective legal markets. See, e.g., Siracuse v. Program for the Dev. of Human Potential, No. 07–CV–2205, 2012 WL 1624291, at *27 (E.D.N.Y. Apr. 30, 2012).

[7] Neither party cites Simmons or addresses its impact on the instant application.

as "Of Counsel" to the firm Altman Schochet LLP. (Id.) Valentine requests $450 per hour. Aaron Altman began practicing in 1992 and has experience in both litigation and real estate transactional work. (Resume of Aaron Altman, Pl. Fees Mot. Ex. D.) Altman is a partner at Altman Schochet LLP; the record does not indicate the size of his firm. Altman seeks $500 per hour. The only evidence plaintiffs cite in support of these rates is a study showing that the median billing rate for 2,020 partners in New York City was $756 per hour. (Martindale.com Article, Pl. Reply Fee Ltr., Ex. C, ECF No. 14-3.)

Defendants contend, without citation to any evidence or authority, that plaintiffs' counsel should receive $350 per hour.

Plaintiffs have not made any attempt to overcome the presumption in favor of the forum rule. Accordingly, my determination of the appropriate hourly rate will be guided by the prevailing rates in the Eastern District of New York.

As an initial matter, the study plaintiffs cite has little relevance because it does not focus on the Eastern District. Moreover, a median billing rate that includes different practice areas and firms of varying sizes is not very helpful in determining the appropriate rate for the specific attorneys at issue here. Cf. Zhiwen Chen v. Cnty. of Suffolk, 927 F. Supp. 2d 58, 72 (E.D.N.Y. 2013) ("While [counsel's] hourly rate should not automatically be reduced based solely on his status as a solo practitioner, the size of the firm may be considered in setting a reasonable hourly rate." (internal citation omitted)).

"In this district, courts have recently awarded fees in the range of $300–450 per hour for partners, $200–300 for senior associates, and $100–200 for junior associates." Barkley, 2012 WL 3095526, at *7. Cases involving real estate litigation provide further guidance. See Melnick v. Press, 06–CV–6686, 2009 WL 2824586, at *9–10 (E.D.N.Y. Aug. 28, 2009) (finding that the

range of appropriate billing rates in real estate litigation is $200–$375 per hour for partners and awarding partners $350 per hour in charging lien dispute);[8] see also Barkley, 2012 WL 3095526, at *3–4, 7–8 (awarding senior attorneys with extensive experience in mortgage lending litigation $400–450 per hour in complex action and noting that these rates were "at the high end of the range"); 4 B's Realty 1530 CR39, LLC v. Toscano, 818 F. Supp. 2d 654, 665 (E.D.N.Y. 2011) (awarding experienced attorneys $375 per hour in contested mortgage foreclosure action); BH99 Realty, LLC v. Qian Wen Li, 10–CV–0693, 2011 WL 1841530, at *6–7 (E.D.N.Y. Mar. 16, 2011) (awarding, in default judgment, $250 per hour for partner with over 20 years of commercial mortgage foreclosure experience) adopted by, 10–CV–693, 2011 WL 1838568 (E.D.N.Y. May 13, 2011).

In light of the above precedent and my own familiarity with this case and the prevailing rates in this district, I find that Valentine and Altman are each entitled to $365 per hour.

### b. Reasonable Number of Hours

"[I]n reviewing a fee application, the court 'should exclude excessive, redundant or otherwise unnecessary hours.'" Siracuse, 2012 WL 1624291, at *33 (quoting Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1999)).

Plaintiff's counsel billed 60.3 hours on this matter—45.2 hours by Valentine and 15.1 hours by Altman. (Time Records, Pl. Fees Mot. Exs. A–B.) Two issues account for a substantial portion of that time. First, counsel spent 18.75 hours on the complaint and TRO motion, which includes drafting the papers and appearing at the TRO hearing and a second conference in state

---

[8] The Court is cognizant of the fact that billing rates rise over time.

11

court.[9]  Second, Valentine spent 9.5 hours researching jurisdictional issues and drafting the pre-motion conference letter to remand the action back to state court.

The Court notes that plaintiffs' counsel has not sought compensation for any work performed after June 27, 2013.  After that date, plaintiffs' counsel filed a reply letter in support of the fee request and engaged in additional settlement discussions in order to finalize the settlement agreement and loan modification.

Defendants challenge a number of specific time entries.  (Defs.' Opp. to Fees Mot. at 3–5, ECF No. 12.)  Plaintiffs' counsel has provided persuasive explanations for the majority of these challenges.  (See Pl. Reply Fees Ltr.)  Defendants, however, do raise one valid point.  Valentine and Altman seek compensation for approximately 9.5 hours that they spent conferring and exchanging emails with each other.[10]  For some of these consultations, both attorneys billed time, for others, only one of the attorneys billed the time.  In total, plaintiffs' counsel billed 14.5 hours for all such consultations.

Depending on the circumstances, some strategic consultation may be warranted, even amongst experienced attorneys.  However, in light of the relatively simple nature of this suit and the experience of plaintiffs' counsel, the amount of time they spent conferring with each other was clearly excessive.  Three hours of consultation should have been more than sufficient.  Accordingly, for this task, counsel will only receive compensation for five total hours.

---

[9] 1.88 hours included in this total are attributable to a third attorney, Mark Nussbaum.  Nussbaum filed the TRO motion and waited in court to hear the motion until Valentine, who was occupied with other matters, arrived.  Defendants do not contest that Nussbaum is entitled to his requested hourly fee of $350 per hour.  Although defendants do dispute the necessity of Nussbaum's time, the Court finds that Nussbaum's time was reasonable.

[10] As defendants note, some of these entries "block-billed" the attorney consultations along with other tasks.  However, the overall time spent on the various tasks listed in these entries does not appear excessive.  Moreover, for a number of these entries, the Court was able to reasonably estimate the time dedicated to consultation by cross-checking the two attorneys' time records against each other.

When counsel's 50.8 hours of compensable work are multiplied by $365 per hour, the resulting lodestar is $18,542.

**2. Adjustments to the Lodestar**

In certain circumstances, the court may adjust the lodestar. Millea, 658 F.3d at 167. However, "the lodestar can be adjusted only by factors relevant to the determination of reasonable attorneys' fees that were not already considered" in determining the reasonable hourly rate and reasonable number of hours required. Id. One such factor is "'the degree of success obtained'"—this is "'the most critical factor' in a district court's determination of what constitutes reasonable attorney's fees in a given case." Barfield v. N.Y. City Health & Hospitals Corp., 537 F.3d 132, 152 (2d Cir. 2008) (quoting Farrar v. Hobby, 506 U.S. 103, 114 (1992)). "[I]n determining the degree of success achieved," courts can consider how the "'the quantity and quality of relief obtained'" compares to "what the plaintiff sought to achieve as evidenced in her complaint." Id. (quoting Carroll v. Blinken, 105 F.3d 79, 81 (2d Cir. 1997)). However, the Second Circuit has "repeatedly rejected the notion that a fee may be reduced merely because the fee would be disproportionate to the financial interest at stake in the litigation." Barbour v. City of White Plains, 700 F.3d 631, 635 (2d Cir. 2012) (denying requested reduction of lodestar in civil rights action and quoting Kassim v. City of Schenectady, 415 F.3d 246, 252 (2d Cir. 2005)); Blue Cross & Blue Shield of New Jersey, Inc., 190 F. Supp. 2d at 423 ("Attorney fee awards under [GBL § 349] do not need to be in proportion to the damages awarded, and may exceed the amount of damages awarded.").

Here, plaintiffs' counsel obtained a favorable result. Plaintiffs avoided foreclosure, the loan is no longer subject to the special quarterly assessments, and plaintiffs were provided with a

loan reconciliation.[11] Plaintiffs also received additional, albeit modest, benefits through the $10,000 reduction in the principal and the quarter-point reduction in the interest rate over the 2011 Modification. On the other hand, plaintiffs' complaint sought damages in excess of $150,000, including punitive damages under GBL § 349. Moreover, the benefits of the new loan modification are contingent and less favorable than a comparable cash payment.[12] In light of the above, the Court finds that a 20% reduction to the lodestar is appropriate. See Pandolfi v. City of Chicago, 12–CV–2328, 2012 WL 3835103 (N.D. Ill. Sept. 4, 2012) (reducing fee award by 20% to account for "limited success" where Section 1983 plaintiffs accepted offers of judgment for $10,000 and $5,000 before the court had set a discovery schedule); cf. Wilson v. Car Land Diagnostics Ctr., Inc., 99–CV–9570, 2001 WL 1491280, at *1–2 (S.D.N.Y. Nov. 26, 2001) (reducing fees for GBL § 349 claim by over 75% where plaintiff "sued on three causes of action and sought $30,000 in actual damages, as well as punitive damages[, but] . . . . was only successful on one of these claims, and received less than 10% of the compensatory damages originally sought, and no punitive damages").

Finally, defendants argue that the Court should further reduce the fee award because, after the Court's June 20, 2013 conference, plaintiffs rejected a reasonable settlement offer on the fees issue. This does not warrant a further reduction. Defendants do not identify the amount of this settlement offer. Furthermore, plaintiffs' counsel only seeks to recover 1.17 hours for their subsequent work on the fees application.

---

[11] It is not clear that the loan reconciliation, and the results thereof, should be counted as a benefit of the settlement agreement. Even assuming that it should be considered as such, it does alter my conclusions herein.

[12] The loan modification is less valuable than a cash payment because Kerr may only be able to capture the full benefits of the modification if she manages to stay timely on her mortgage payments. Moreover, the present value of the quarter-point interest rate reduction is substantially less than the approximately $12,000 in total interest that Kerr will save over the remaining 22 years on the loan.

After factoring in the 20% reduction, the Court awards plaintiffs $14,833.60 in attorney's fees.

**C. Costs**

Plaintiffs seek $687.78 in costs. However, GBL § 349 "do[es] not mention, and hence do[es] not provide for, a recovery of costs." Indep. Living Aids, Inc. v. Maxi-Aids, Inc., 25 F. Supp. 2d 127, 134 (E.D.N.Y. 1998). Accordingly, this request is denied.

### III. CONCLUSION

For the reasons stated above, the Court awards Kerr $14,833.60 in attorney's fees. The Clerk of the Court is respectfully directed to enter an attorney's fees judgment for $14,833.60 in favor of Kerr against defendants HSBC and Ocwen, jointly and severally.

SO ORDERED.

Dated: December 11, 2014
Brooklyn, New York

                                                 /s/ (JMA)
                                              JOAN M. AZRACK
                                              UNITED STATES MAGISTRATE JUDGE